**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Suzanne Hale, et al., | No. CV-18-03597-PHX-MTL |
| Plaintiffs, | **ORDER** |
| v. | |
| Norcold Incorporated, et al., | |
| Defendants. | |

This Order addresses the Defendants' Motion for Partial Summary Judgment on the issues of punitive damages and emotional distress damages. (Doc. 56.) A recreational vehicle ("RV") owned by Suzanne and Jerry Hale (collectively "Plaintiffs" or the "Hales") was destroyed by a fire. Plaintiffs contend that a defective Norcold Series 1200 refrigerator installed in their RV is to blame. This refrigerator's cooling system works through a process of gas absorption. The cooling unit heats "a solution of ammonia, water and chromate, which ultimately causes the ammonia to evaporate resulting in cooling in the refrigerator box." (Doc. 56 at 2.) Plaintiffs allege that, due to a design flaw and the propensity for internal corrosion, both of which were previously known to Defendants, the cooling system's boiler tube leaked and ignited the fire.[1] (Doc. 1-3 at ¶¶ 60, 61.)

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material

---

[1] Additional factual detail is in the Order on the Motion to Dismiss. (Doc. 41.)

1  fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A

2  genuine issue of material fact exists if "the evidence is such that a reasonable jury could

3  return a verdict for the nonmoving party," and material facts are those "that might affect

4  the outcome of the suit under the governing law . . . ."  *Anderson v. Liberty Lobby, Inc.*,

5  477 U.S. 242, 248 (1986). At the summary judgment stage, "[t]he evidence of the non-

6  movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at

7  255 (internal citations omitted); *see also Jesinger v. Nevada Fed. Credit Union*, 24 F.3d

8  1127, 1131 (9th Cir. 1994) (court determines whether there is a genuine issue for trial but

9  does not weigh the evidence or determine the truth of matters asserted).

10  **II.    DISCUSSION**

11         This case is here on diversity jurisdiction. The Court will analyze the arguments

12  raised in the Motion under Arizona substantive law. *See Mason & Dixon Intermodal, Inc.*

13  *v. Lapmaster Int'l LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011) ("When a district court sits in

14  diversity, or hears state law claims based on supplemental jurisdiction, the court applies

15  state substantive law to the state law claims.").

16         **A.    Punitive Damages**

17         Plaintiffs seek a recovery of punitive damages. Defendants advance three arguments

18  supporting their motion for summary judgment on punitive damages.

19              1.    Exemption from Punitive Damages Under A.R.S. § 12-689(A)(2).

20         In 2012, the Arizona Legislature enacted an exemption from punitive damages

21  liability where:

22              The product, activity or service complied with all statutes of
              this state or the United States or standards, rules, regulations,
23              orders or other actions of a government agency pursuant to
              statutory authority that are relevant and material to the event or
24              risk allegedly causing the harm and the product, activity or
              service complied at the time the product left the control of the
25              manufacturer or seller.

26  A.R.S. § 12-689(A)(2).[2]

27         Defendants contend that this statute exempts them from punitive damages liability

28  _____

[2] The statute establishes two other exemptions that are not at issue in this case.

1  because the Series 1200 refrigerator in the Hales' RV complied with the standards for gas

2  absorption refrigerators codified by the United States Department of Housing and Urban

3  Development ("HUD"). These standards were developed by the American National

4  Standards Institute ("ANSI") and adopted by reference in HUD regulations for

5  manufactured homes. Plaintiffs contest the application of § 12-689(A)(2).

6          It is the Court's duty in interpreting statutes to give effect to the Arizona

7  Legislature's intent. *United States v. Hernandez-Quintania*, 874 F.3d 1123, 1126 (9th Cir.

8  2017). The best indication of intent is the statutory text itself. *Id*. Section 12-689(A)(2)

9  establishes an exception to punitive damages liability for products that are designed and

10  manufactured according to government standards. In order to qualify for the exemption,

11  (1) the product must have been manufactured according to standards adopted by a

12  government agency, (2) the standards must be "relevant and material to" the product defect

13  that caused the harm; and (3) the product must have complied with the standards "at the

14  time the product left" the manufacturer's control. A.R.S. § 12-689(A)(2).

15          Defendants explain that the Series 1200 refrigerator was designed and

16  manufactured according to standards adopted by HUD for gas absorption refrigerators. 24

17  C.F.R. §§ 3280.702 (defining "gas refrigerator"); 3280.703 (adopting by reference ANSI

18  standards for gas-fueled refrigerators); 3280.4 (stating that industry standards incorporated

19  by reference shall "have the same force and effect as this Standard (24 CFR part 3280) . . ."

20  except where inconsistent); 3280.4(j)(13) (recognizing adoption by reference of ANSI

21  standards for gas-fueled refrigerators). Defendants believe that, based on these standards,

22  they should benefit from exemption to punitive damages.

23          Plaintiffs argue that § 12-689(A)(2) does not apply because the HUD standards do

24  not govern gas absorption refrigerators installed in recreational vehicles. While that may

25  be true, the statute does not require that the agency that initially approved the standards

26  exercise continuing regulatory authority over the product as used in any given market. The

27  product need only be manufactured according to the adopted specifications. To hold

28  otherwise would create an anomaly. Defendants could be exempt from punitive damages

arising from a defective refrigerator installed in a manufactured home, but, at the same time, exposed to this liability relating to the same defect from the same refrigerator installed in a recreational vehicle.

Plaintiffs next oppose applying § 12-689(A)(2) because the specific design defect alleged in this case—"the use of the Single Weld Design to attach the electric heater pockets to the outside of the refrigerator cooling unit boiler tube"[3]—is not specified in any of the HUD-adopted ANSI standards. The point made here is that the standards that do exists are not "relevant and material to the event or risk allegedly causing the harm." *See* A.R.S. § 12-689(A)(2).

In response to this argument, Defendants identify the different regulatory standards that govern the performance of the cooling unit. These include the chemical composition of refrigerants and the use of refrigeration principles. ANSI §§ 1.1.2; 1.1.3. The standards provide specifications for a sealed absorption system, which includes burst tolerances and pressure-releasing devices. *Id.* at § 1.10. They also reference specifications for the refrigerator's electrical equipment and wiring. *Id.* at § 1.22.

Defendants further explain that these standards relate to the Plaintiffs' claims in this case. Answering Plaintiffs' contention that the single weld design was defective, Defendants point out that ANSI § 1.10.1 requires that a manufacturer demonstrate "that the burst strength of the [] system is not less than five times the maximum working pressure."[4] They explain that the Series 1200 refrigerator satisfies this standard. (Doc. 57 at 3 ¶ 9.) The number of welds used in attaching the heating pockets is relevant so long as the unit satisfies the standard's burst tolerances. The refrigerator at issue here does. Defendants also explain that it is recognized within the industry that gas absorption refrigerators carry a risk of corrosion due to the solution of water and ammonia and its interaction with steel. (*Id.*

---

[3] Supplemental Briefing on A.R.S. § 12-689 (Doc. 116) at 4; Compl. (Doc. 1-3) at 11:5 – 19:13.
[4] Defendants cite ANSI § 1.10.2, which requires the use of an enumerated device such as a fusible plug to release additional outside pressure. They claim that this safety feature exists to release pressure in case of a fire. It is not clear to the Court, based on the submitted materials, whether the fusible plug exists to relieve increased pressure due to an external fire source or whether it is also designed to avoid fires caused by internal corrosion.

at ¶ 10.)

The Court finds that Defendants have satisfied their burden to show that the punitive damages exemption in A.R.S. § 12-689(A)(2) applies to the Norcold Series 1200 refrigerator. The product is designed according to the ANSI standards, which are adopted by reference in HUD regulations. The standards govern the design of the gas absorption system. This includes the boiler, boiler tube, and the refrigerant, among other things. These are the components that are "relevant and material to the event or risk allegedly causing the harm." *See* A.R.S. § 12-689(A)(2). There is no evidence to show that this was not the case "at the time the product left the control of the manufacturer." *Id*.

That a product is manufactured, marketed, and sold pursuant to design specifications approved by a government agency does not mean that a product will be free from defect. If that was the case, there would have been no need for the Arizona Legislature to enact § 12-689(A). The Arizona Legislature, instead, recognized that sometimes such a product will malfunction and, regretfully, cause personal injury or property loss. The Legislature implicitly acknowledged that, where a product follows recognized standards, the manufacturer may still be required to compensate for that loss. This category of damages remains untouched by § 12-689(A).

Punitive damages are not compensatory but are, instead, a penalty for reprehensible conduct. *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008) (recognizing a consensus among courts that punitive damages serve as retribution and for deterrence). It was the Arizona Legislature's determination punitive damages are an excessive penalty when assessed against a manufacturer of a product that adheres to government specifications. Such is the case here, and summary judgment shall therefore be granted in Defendants' favor.

       2.     <u>Norcold's Product Safety Measures</u>.

Defendants also move for summary judgment on Plaintiffs' punitive damages claim based on Norcold's efforts to improve safety of the Series 1200 cooling system. The Motion (Doc. 56 at 7-11) and the accompanying Statement of Facts (Doc. 57 at 5-9, ¶¶ 13-

32) provide a detailed history of "actions Norcold has taken since 1999" to reduce the risk of accidental fires caused by the gas absorption refrigeration process. These actions include investigating reports of product fires and conducting tests, issuing safety recalls, exploring ways to reduce the risk of internal corrosion, and developing additional product safety features, such as a thermal safety switch. (*Id*. at 5, ¶ 13-16.) Defendants contend that Norcold's past and present efforts to improve product safety show the absence of the requisite "evil mind" to support punitive damages. Considering their actions, moreover, Defendants further contend that Plaintiffs cannot overcome the applicable clear-and-convincing evidentiary threshold.

Plaintiffs describe this history as "a rose-colored narrative." (Doc. 73 at 4.) They maintain that, since at least 1999, Norcold has been aware of the alleged defective defect cooling, that the boiler tube could fail due to internal corrosion, and that such failure could cause a leak and eventual fire. (*Id*. at 5, 10.) Setting aside Norcold's recalls and product enhancements, they allege, the company knew about the continued danger yet still marketed the product and represented it as safe. (*Id*. at 7-8.) The representations, for example, include a warranty statement claiming that the Norcold products will "be free from defect for three (3) years from the date of purchase." (*Id*. at 8 n.16.) Plaintiffs contend that this statement evidences Defendants "concealing their actual knowledge of serious design defects inherent in the product when it was manufactured[,] which created a propensity for the cooling units to leak flammable gases and toxic substances, putting lives and property at risk." (*Id*. at 8.)

It is a well-established principle of Arizona law that "[p]unitive damages are appropriate 'only in the most egregious of cases,' in which the defendant's 'reprehensible conduct' and 'evil mind' are proven by clear and convincing evidence." *SWC Baseline & Crimson Investors, L.L.C. v. Augusta Ranch Ltd. P'ship*, 228 Ariz. 271, 289 (App. 2011) (quoting *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 498 (App. 2008)). The requirement for an "evil mind" is met when a defendant has "consciously disregard[ed] the unjustifiable substantial risk of significant harm." *Id*. (quoting *Hyatt Regency Phoenix Hotel Co. v.*

*Winston & Strawn*, 184 Ariz. 120, 132 (App. 1995)). A court may grant a motion for summary judgment on punitive damages where no "reasonable jury could find the requisite evil mind by clear and convincing evidence." *Felipe v. Theme Tech Corp.*, 235 Ariz. 520, 528 (App. 2014), (internal quotation marks omitted) (quoting *Thompson v. Better-Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 556 (1992)).

Gas absorption refrigerators, like the Norcold Series 1200, are used in recreational vehicles for at least two reasons. First, electrically operated refrigerator motors require an energy source where one may not be available on the open road or at a campsite. Second, unlike electric motors, the gas absorption cooling system lacks moving parts. This allows it to operate with less noise and, in close quarters, this is a welcome benefit for the occupants.

In operational terms, and simply stated, the cooling system involves using a boiler and steel tubing to heat a mixture of water, ammonia, and chromate.[5] The steel tubing is also referred to as a boiler tube. The evaporation process cools the food storage area and permits freezing for ice cubes. According to Defendants' expert, Eric Klein, steel tubing is the industry standard and that is what is used in the Norcold refrigerator. (Doc. 57 at 3 ¶ 8.) Mr. Klein's declaration explains that "[e]very known gas absorption refrigerator carries a risk of corrosion. This is because the solution of water and ammonia for the refrigerant can create a corrosive environment for the steel tubing used in its construction." (*Id*. at ¶ 10.)

Understanding that corrosion can occur within the cooling system, Norcold has, since 1999, taken several measures to mitigate the risk of injury. It has conducted continuous internal research and development and third-party reviews. (*Id.* at 5 ¶ 13.) These efforts have led to product safety improvements. This includes adding sodium chromate to reduce reactions that cause corrosion. (*Id.* at 3-4 ¶ 10.) It engineered two product safety designs for detecting heightened temperatures in the boiler area. Norcold describes these features as a "Thermal Safety Switch" and a "High Temperature Sensor." (*Id.* at 5 ¶¶ 16-17.) Defendants explain that these features "operate to protect the boiler from the

---

[5] The Hales' RV used a propane boiler.

possibility of a thermal event by preventing the region from reaching a high temperature that could lead to such an event occurring." (Doc. 56 at 4.)

Norcold also participated voluntary recalls pursuant to NHTSA regulations. One recall involved an earlier-generation refrigerator that used a similar gas absorption system. Later, in 2002, Norcold extended this recall to the 1200 Series unit. (Doc. 57 at 5 ¶ 14.) It launched another recall, in 2010, "to retrofit all [pre-existing] 1200 series refrigerators with the [High Temperature Sensor] safety device." (*Id*. at 5 ¶ 17.)

Plaintiffs discount this effort. Their position is that it was enough that Norcold and the other Defendants knew of the risks associated with the gas absorption design and continued to sell the product anyway. An argument of this sort is not enough to satisfy the standard for punitive damages. "The fact that a manufacturer continued to market a product was not itself enough to show the evil mind necessary for punitive damages." *See Piper v. Bear Med. Sys., Inc.*, 180 Ariz. 170, 180 (App. 1993).

It is clear from the evidence that no reasonable jury would determine that Defendants consciously disregarded an unjustifiable risk of serious harm to the Hales. Quite the contrary, the evidence uniformly shows that Norcold actively responded to mitigate known problems with the gas-absorption design. The Court finds that Defendants have satisfied their burden and they are entitled to summary judgment on Plaintiffs' punitive damages claim.

3.      The *Etter* Class Action Settlement.

Defendants argue that the class action settlement agreement approved by the Central District of California in *Etter, et al. v. Thetford Corp., et al.*, No. 13-CV-00081-JLS (Doc. 412-1), bars Plaintiffs' recovery of punitive damages in this case. In *Etter*, the district court certified a settlement class consisting of persons who "currently own, or formerly owned, a Norcold 1200 Series Gas Absorption Refrigerator or Cooling Unit that was manufactured during the time period starting January 1, 2002 and continuing to and including October 1, 2012." (*Etter*, Doc. 563 at 4.) The Hales are part of the settlement class.

The Release and Waiver provision in the court's settlement order provides that, in

consideration for settlement payments, the class members class members fully release Norcold and the other defendants from "damages of any kind and/or type regarding the subject matter of the Action, including, but not limited to, compensatory, exemplary, [and] punitive [damages] . . . ." (*Id.* at 8, ¶ 23.) The Release and Waiver contains a savings clause, stating that, "[n]otwithstanding the foregoing, the . . . Class Members[] are not releasing claims for personal injury, wrongful death or actual physical property damage arising from a leak, fire or other accident involving any Subject Gas Absorption Refrigerator pursuant to this Settlement Agreement." (*Id.* at 9, ¶ 24.)

In the Motion for Partial Summary Judgment, Defendants argue that the *Etter* settlement precludes Plaintiffs from seeking punitive damages in this case. According to Defendants' theory, Paragraph 24, the savings clause, allows the Hales to maintain a separate action to recover damages for personal injury and property loss, giving rise to this action. By not opting out of the *Etter* class settlement, however, the Hales forfeited their opportunity to recover punitive damages by virtue of the broadly drafted Release and Waiver in Paragraph 23.

Plaintiffs disagree. They acknowledge the *Etter* settlement agreement and the release and waiver language. At the same time, they place greater emphasis on the savings provision and argue that they reserved their right to recover a full spectrum of damages, available under Arizona law, "for personal injury, wrongful death or actual physical property damage." This spectrum includes punitive damages.

The Hales filed a Motion to Reopen the *Etter* case. They asked for a ruling on whether their punitive damages claims were released as part of the class action settlement agreement and final order. The Hales' motion is fully briefed, and they are awaiting a decision. As it has been determined in this Order that Defendants are entitled to summary judgment on punitive damages for other reasons, and out of deference to the motion pending before the Central District of California, the Court reserves review of this issue.

**B.     Emotional Distress Damages**

Plaintiffs' comprehensive damages theory includes hedonic damages, also known

- 9 -

as loss of enjoyment of life, and intentional infliction of emotional distress. These damages claims are not specified in the Complaint. The claims were disclosed as part of the discovery process. Defendants argue that Arizona law does not support emotional distress damages under the facts and circumstances present here because the Hales have not suffered physical injury. To that end, Defendants point out that the Hales were not within the "zone of danger" that would subject either of them to bodily harm, neither of them suffered a manifestation of any physical injury, and neither Plaintiff was subjected to extreme and outrageous conduct. Defendants also cite Arizona caselaw holding that emotional distress damages are not available for property damage.

Plaintiffs concede that they are free from physical injury (Doc. 73 at 18), but they contend that loss of enjoyment of life damages are recoverable as part of their general damages claim. They also allege that Defendants' conduct was extreme and outrageous on the basis that Norcold "[is] knowingly marketing a dangerously defective refrigerator, refusing to fix it or warn of the inherent dangers, and concealing the risks from both federal regulators and the [P]laintiffs . . . ." (Doc. 73 at 18.) Plaintiffs further argue that the Defendants "recklessly disregarded" the risk that they "would suffer emotional distress . . . and suffer a substantial diminution in the enjoyment of life." (*Id.*)

The Arizona courts recognize hedonic damages as part of a general damages claim. This category of damages "compensate[s] a person for the limitations caused by the defendant's tortious conduct on the injured person's ability to participate in and derive pleasure from the normal activities of daily life, or for the individual's ability to pursue his or her talents, recreational interests, hobbies, or avocations." *Mendoza v. McDonald's Corp.*, 222 Ariz. 139, 150 n.17 (App. 2009); *see generally* David E. DePianto, *Tort Damages and the (Misunderstood) Money-Happiness Connection*, 44 Ariz. St. L.J. 1385, 1397 (Winter 2012).

Plaintiffs rely on *Ogden v. J.M. Steel Erecting, Inc.*, 201 Ariz. 32 (App. 2001), to support their claim for hedonic damages. That case does not help them here, as the plaintiffs in that case sued for wrongful death and personal injury caused by an automobile accident.

*Id.* at 34. Hedonic damages ordinarily are not available where the plaintiff has suffered property loss in absence of personal injury. *See Price v. High Pointe Oil Co.*, 493 Mich. 238, 246 (2013) (holding that emotional distress and other noneconomic damages are not recoverable for negligent destruction of property). Plaintiffs have not identified any Arizona authority that permits a recovery of loss of enjoyment of life without physical injury.

Plaintiffs' emotional distress damages claim fails as well and for similar reasons. In *Kaufman v. Langhofer*, 223 Ariz. 249 (App. 2009), the court denied emotional distress damages against a veterinarian accused of negligently causing the death of the plaintiff's exotic bird. *Id.* at 276. The court concluded that the bird was personal property and it could not serve as a subject of emotional distress damages. *Id.* That said, however, the *Kaufman* decision acknowledged some cases recognizing the availability of hedonic damages for property loss where "the tortious act directly harmed the plaintiff and affected or burdened a personal, as opposed to an economic or other interest belonging to the plaintiff." *Id.*

Turning to the facts of this case, neither Plaintiff was present in or around the RV during the fire. Mr. Hale was golfing nearby and saw smoke coming from what appeared to be the direction of his RV. Ms. Hale was out of town and nowhere near the scene of the fire. Neither of them suffered any injuries from the fire, such as burns, smoke inhalation, or other bodily injury. Plaintiffs' dog was inside the RV when the fire started. The dog was rescued when bystanders broke a window. The dog was not injured, and it is alive today.

Mr. Hale admits that he did not suffer any physical injury and he testified at his deposition that the basis of his emotional distress is the property loss and the danger posed to his dog. Ms. Hale admits having emotional distress related to the loss of her parents, who passed away shortly before the fire occurred. She testified at her deposition that her emotional distress claim in this case is based on the "whole situation" of the "loss of her parents, loss of her home (the RV) and the fire and her dog almost being killed in it." (Doc. 57-11 at 10.)

There is no basis on the record here to support Plaintiffs' claim for emotional

distress and hedonic damages. That there is no personal injury is obvious. There is also lacking evidence to a non-proprietary personal interest held by Plaintiffs. The danger posed to Plaintiffs' dog is insufficient, *see Kaufman*, 223 Ariz. at 276, and neither Plaintiff was within the "zone of danger" during the fire, *see Keck v. Jackson*, 122 Ariz. 114, 115-16 (1979). Plaintiffs have presented no evidence of physical or medical injury arising from their claimed exposure to carcinogens. *See DeStories v. City of Phoenix*, 154 Ariz. 604, 609 (App. 1987).

Finally, Plaintiffs claim that they are entitled to emotional distress because Defendants' conduct was "extreme and outrageous . . . in knowingly marketing a dangerously defective refrigerator, refusing to fix it or warn of the inherent dangers, and concealing the risks from both federal regulators and the plaintiffs." (Doc. 73 at 18.[6]) They cite to *Ford v. Revlon*, 153 Ariz. 38 (1987), an employment case where the plaintiff alleged sexual harassment against her supervisor. Her complaint asserted an intentional infliction of emotional distress claim for relief, one of the elements is that the defendants conduct "must be extreme and outrageous." *Id*. at 43 (internal marks omitted). The other elements of this tort are that "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct," and that "severe emotional distress must indeed occur as a result of defendant's conduct." *Id*. There is no evidence in the record that Defendants here intended to cause any emotional distress to the Hales, or that they recklessly disregarded the near certainty that it would occur. As previously stated, there is no record evidence of severe emotional distress inflicted on the Hales as a result of Defendants' conduct.

All in all, Plaintiffs' theory for recovery on this category of damages equates, at best, to pure speculation. *Keck*, 122 Ariz. at 115-16 ("Damages for emotional disturbance alone are too speculative."). Summary judgment is granted to Defendants on this issue.

---

[6] Defendants' reply brief points out that Plaintiffs have advanced this justification in their response in opposition to the summary judgment motion. Plaintiffs' Complaint does not plead a claim for relief for intentional infliction of emotional distress. Summary judgment may be granted for this reason, alone. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).

III.    **CONCLUSION**

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Partial Summary Judgment to Dismiss Plaintiffs' Claims of Emotional Distress and Punitive Damages (Doc. 56) is granted. Because other claims remain pending, the Clerk of the Court shall not enter judgment at this time.

Dated this 20th day of April, 2020.

Michael T. Liburdi
United States District Judge